SCHREIBER FOODS, INC., Plaintiff,

v.

BEATRICE CHEESE, INC. and Kustner Industries, S.A., Defendants.

Schreiber Foods, Inc., Plaintiff,

v.

Great Lakes Cheese Co., Inc., Great Lakes Cheese of La Crosse Wisconsin, Inc., and Great Lakes Cheese of Wisconsin, Inc., Defendants.

Nos. 97–C–11, 97–C–566.

United States District Court, E.D. Wisconsin.

Feb. 20, 2004.

Michael Mazza, Richard, Megley, Jr., Thomas Scavone, Chicago, IL, Paul Vickery for Plaintiff.

James Quarles, William Lee, William McElawain, Washington, DC, for Defendants.

### DECISION AND ORDER

ADELMAN, District Judge.

Plaintiff Schreiber Foods, Inc. ("Schreiber Foods"), a corporation located in Green Bay, Wisconsin, brought patent infringement actions against defendants Kustner Industries, S.C. ("Kustner") and the Great Lakes Cheese Co., Inc. and several companies associated with it (collectively "Great Lakes") alleging infringement of U.S. Patent No. 5,440,860 ("'860"), which covers machinery for packaging processed cheese in hermetically sealed slices.[1] While the actions were pending, Schreiber Foods added claims of infringement of U.S. Patent 5,701,724 ("'724") to both suits. Prior to trial, the actions against Kustner and Great Lakes were consolidated, and in August 1998 a jury found that both defendants had infringed both patents and awarded Schreiber Foods over $26 million in damages. After various post-verdict motions and an appeal, on

1. Schreiber Foods also sued Beatrice Cheese, Inc., but that matter has since been settled.

September 12, 2002, I entered judgment for Schreiber Foods.

Pursuant to Fed.R.Civ.P. 59 and 60, defendants now move to vacate the judgment on the ground that this court lacked jurisdiction to enter it and, alternatively, on the grounds that the judgment was obtained through misrepresentation and that defendants have recently discovered new evidence. Defendants' motions arise out of their post-judgment discovery that while the action against Kustner was pending and before the action against Great Lakes was commenced, Schreiber Foods assigned the '860 patent to a subsidiary and took back a non-exclusive license. Defendants argue that as a non-exclusive licensee, Schreiber Foods lacked standing to bring the infringement actions and that, as a result, the action against Kustner became moot, and the court never acquired jurisdiction of the action against Great Lakes. Defendants also contend that Schreiber Foods's failure to disclose the assignment and licensing agreement was a prejudicial misrepresentation and that the assignment and licensing agreement constitute newly discovered evidence.

## I. FACTS AND BACKGROUND

On August 5, 1995, the United States Patent and Trademark Office ("PTO") issued the '860 patent to Schreiber Foods. On January 7, 1997, Schreiber Foods sued Kustner for infringement of the '860. On March 31, 1997, while the action was pending, Schreiber Foods assigned the '860 to its subsidiary, Schreiber Technologies, Inc. ("Schreiber Tech"), a passive investment corporation ("pic"), and took a non-exclusive license in the patent.

Corporations establish pics for the purpose of reducing their state taxes. A corporation will establish a pic in a state with either no corporate income tax or a minimal tax and assign its intellectual property, such as patents, to the pic in exchange for stock. Pamela S. Chestek, *Control of Trademarks by the Intellectual Property Holding Company*, 41 IDEA 1, 2 (2001). The exchange of patents for stock is a non-taxable transfer under 26 U.S.C. § 351. The pic then grants back to the parent a non-exclusive license to use the patents in return for a specified royalty. Chestek, *supra*, at 2. One reason that the parent takes back a non-exclusive rather than an exclusive license is to avoid the appearance of a sham transaction, which might draw the attention of state tax authorities. Robert A. Matthews, Jr., *A Potential Hidden Cost of a Patent–Holding Company: The Loss of Lost–Profit Damages*, 32 AIPLA Q.J. (forthcoming Fall 2004); Robert A. Matthews Jr., *Patent-holding Companies Hold Risks*, Nat. L.J., June 16, 2003, at S7.

The royalty payments that the parent pays to the pic are a business expense to the parent and therefore tax deductible. Chestek, *supra*, at 2. By relying on the corporate distinctness of the pic and the obligation to pay a royalty, the parent enjoys a tax deduction even though, as the sole shareholder of the pic, the parent effectively pays itself the royalty. Matthews, *supra*. By establishing the pic in a no or low tax state, the pic's income from the royalty payments is also untaxed or only minimally taxed. Chestek, *supra*, at 2. Further, the pic's income is later funneled back to the parent, its sole stockholder, in the form of non-taxable dividends. *Id.* Thus, the net effect of creating a pic can be a substantial reduction in state taxes for the corporate enterprise.

Prior to creating Schreiber Tech, Schreiber Foods received advice from the accounting firm, Ernst & Young ("Ernst"), concerning how to establish and contract with a pic so as to be able to defend the arrangement against a challenge from

state tax authorities. Ernst advised Schreiber Foods that it could not retain any rights in the patents transferred to the pic. Ernst also stated that it was essential that the pic have corporate substance, and that it be located in a state other than Delaware or Nevada, which were so closely associated with pics that locating it there would raise a red flag for tax collectors.

Schreiber Foods decided to establish a pic and engaged a Milwaukee law firm to assist with the transaction. The law firm incorporated Schreiber Tech in Minnesota. Schreiber Foods assigned the '860 and other patents to Schreiber Tech and took back a non-exclusive license to use the patented invention in return for a royalty of 1.5 percent of net sales of products resulting from the patent. Under the terms of the license, Schreiber Tech retained the sole right to initiate and control any action for infringement of the patent, including for infringement occurring prior to the assignment. Further, the licensing agreement could only be modified in writing.

On May 13, 1997, after it had assigned the '860 patent to Schreiber Tech and become a non-exclusive licensee, Schreiber Foods commenced an action against Great Lakes for infringement of the '860.

At about the same time, Schreiber Foods applied to the PTO for what was to become the '724 patent. The PTO initially rejected the application on the ground that the requested patent was obvious in light of the '860, and that issuance of it would constitute double patenting. However, the PTO subsequently agreed to issue the patent if Schreiber Foods filed a terminal disclaimer agreeing that the patent would be enforceable only as long as it was commonly owned with the '860. On July 10, 1997, Schreiber Foods filed such a disclaimer. When it filed the terminal disclaimer, Schreiber Foods did not disclose to the PTO that it had already assigned the '860 patent to Schreiber Tech and become a non-exclusive licensee. On December 30, 1997, the PTO issued the '724 patent to Schreiber Foods. Schreiber Foods did not assign the '724 to Schreiber Tech. In January 1998, Schreiber Foods added claims of infringement of the '724 to its suits against Kustner and Great Lakes.

In its infringement actions against defendants, Schreiber Foods did not name Schreiber Tech as a party. Moreover, at no time in the course of the litigation did Schreiber Foods disclose to defendants that it had assigned the '860 to Schreiber Tech and taken a non-exclusive license in the patent. During discovery, defendants asked Schreiber Foods for documents relating to agreements or licenses that it had entered into involving the patents in suit. In response, Schreiber Foods produced no documents and affirmatively represented that no licenses pertaining to the patents were in effect.

At trial, Thomas Badciong, a Schreiber Foods director who was present at a meeting nine months previous at which the Schreiber Foods board approved the assignment of the '860 patent to Schreiber Tech, testified as follows:

Q. Let me show you, Mr. Badciong, what have been marked as Plaintiff's Exhibit 1 and 2. Can you identify those for the jury, please?

A. Yes, I can.

Q. And what are the two exhibits? What's Exhibit 1?

A. Exhibit 1 is a copy of the—or is the '860 patent.

Q. And Exhibit 2?

A. It's the '724 patent.

Q. These patents are owned by Schreiber Foods; is that right?

A. Yes, they are.

Q. And for what period of time did Schreiber own those patents?

A. Since we received them.

Q. Since they were issued by the Patent Office?

A. Yes, since they were issued by the Patent Office.

(McElwain Decl. Ex. 11.)

Schreiber Foods's damage expert, Joseph Gemini, testified at trial concerning the damages that Schreiber Foods incurred as the result of defendants' infringement of the patents in suit. His estimate was based on the assumption that Schreiber Foods held legal title to the '860 patent and that the '724 patent was enforceable. He testified that Schreiber Foods was entitled to damages for lost profits and a royalty at a rate of about nine percent—approximately six times the 1.5 percent paid by Schreiber Foods to Schreiber Tech.

Schreiber Foods's trial attorneys state that during the trial they were not aware that Schreiber Foods had assigned the '860 to Schreiber Tech and became a non-exclusive licensee, but that they discovered such facts about five weeks after the trial. They chose not to disclose the information to defendants or to the court. However, they advised Schreiber Foods to terminate the licensing agreement and have Schreiber Tech reassign the patent to it. On April 21, 1999, Schreiber Tech cancelled the licensing agreement with Schreiber Foods and reassigned the patent to it.

Additional facts will be stated in the course of the decision.

## II. JURISDICTION

### A. Law of Standing and Mootness

#### 1. General Principles and Constitutional Basis

■ Federal courts are courts of limited jurisdiction. *Kokkonen v. Guardian Life Ins. Co. of Am.*, 511 U.S. 375, 377, 114 S.Ct. 1673, 128 L.Ed.2d 391 (1994). They are presumptively without jurisdiction over civil actions, and the burden of establishing the contrary rests upon the party asserting jurisdiction. *Id.* Federal judicial power derives from Article III of the Constitution. Article III, Section 2 delineates the absolute limit on federal courts' jurisdiction. *Ankenbrandt v. Richards*, 504 U.S. 689, 695, 697, 112 S.Ct. 2206, 119 L.Ed.2d 468 (1992). Under Article III, federal courts may adjudicate only actual "cases" or "controversies." *Allen v. Wright*, 468 U.S. 737, 750–51, 104 S.Ct. 3315, 82 L.Ed.2d 556 (1984); *see also Simon v. E. Ky. Welfare Rights Org.*, 426 U.S. 26, 37–38, 96 S.Ct. 1917, 48 L.Ed.2d 450 (1976) (stating that no principle is more fundamental to the judiciary's proper role in our system of government than the constitutional limitation of federal court jurisdiction to actual cases or controversies).

#### a. Standing

■ The requirement that a litigant have standing to bring a lawsuit in a federal court is derived from the case or controversy requirement. *See Allen*, 468 U.S. at 750, 104 S.Ct. 3315; *see also E. Ky. Welfare Rights Org.*, 426 U.S. at 37, 96 S.Ct. 1917 (stating that the Article III aspect of standing is whether the plaintiff has alleged a sufficient personal stake in the outcome of the controversy so that he can invoke federal jurisdiction). To have standing, a plaintiff must be entitled to have the court decide the merits of his claim. *Warth v. Seldin*, 422 U.S. 490, 498, 95 S.Ct. 2197, 45 L.Ed.2d 343 (1975). Standing focuses on the party seeking to get his complaint before a federal court and not on the issues he wishes to have adjudicated. *E. Ky. Welfare Rights Org.*, 426 U.S. at 37–38, 96 S.Ct. 1917.

■■ If a suit is founded directly on a statute, one looks to the statute to determine whether the would-be plaintiff has standing. Wm. J. Fletcher, *The Structure of Standing*, 98 Yale L.J. 221, 264 (1988). Whether the plaintiff has standing depends on whether the statute confers on him the right to enforce the duty assertedly breached by the defendant. *Id.* at 265; *see also Prima Tek II, L.L.C. v. A–Roo Co.*, 222 F.3d 1372, 1376–77 (Fed.Cir.2000) (stating that standing to sue for patent infringement derives from the Patent Act).[2]

### b. Mootness

■ Closely related to standing is the doctrine of mootness. A case is moot when a plaintiff who had standing to commence an action in federal court because he had a sufficient personal stake in the dispute at its inception gives up that stake in the course of the litigation. *See North Carolina v. Rice*, 404 U.S. 244, 246, 92 S.Ct. 402, 30 L.Ed.2d 413 (1971). Mootness focuses on whether the plaintiff maintains an interest in the outcome of the dispute that is sufficient to continue the action. *See Lewis v. Cont'l Bank Corp.*, 494 U.S. 472, 477, 110 S.Ct. 1249, 108 L.Ed.2d 400 (1990); *see also U.S. Parole Comm'n v. Geraghty*, 445 U.S. 388, 397, 100 S.Ct. 1202, 63 L.Ed.2d 479 (1980) (stating that when plaintiff gives up interest entitling him to sue, case is moot).

The mootness doctrine is generally thought to be grounded in the case or controversy requirement of Article III. *See Liner v. Jafco, Inc.*, 375 U.S. 301, 306 n. 3, 84 S.Ct. 391, 11 L.Ed.2d 347 (1964) (stating that because of Article III requirement that exercise of judicial power depends on existence of a case or controversy, federal courts lack jurisdiction to hear moot cases); *Arizonans for Official English v. Arizona*, 520 U.S. 43, 64, 67, 117 S.Ct. 1055, 137 L.Ed.2d 170 (1997) (stating that standing is an aspect of case or controversy requirement, which must be satisfied at all stages of the case); *see also Honig v. Doe*, 484 U.S. 305, 317, 108 S.Ct. 592, 98 L.Ed.2d 686 (1988) (stating that even though the dispute between the parties was alive when the case was filed, the case or controversy requirement prevents court from exercising jurisdiction if dispute does not remain alive throughout the case).

■ In *Honig*, Chief Justice Rehnquist concurred, but questioned whether the nexus between Article III and mootness was logical. Some scholars have also argued that the mootness doctrine should operate on a prudential rather than a constitutional basis. *See, e.g.*, Evan Tsen Lee, *Deconstitutionalizing Justiciability: The Example of Mootness*, 105 Harvard L.Rev. 603, 609 (Jan.1992). However, a majority of the Supreme Court adheres to the proposition that mootness is derived from Article III. Thus, if at any time in litigation a case becomes moot, it is no longer justiciable, and a federal court must dismiss it for lack of jurisdiction. *See Rice*, 404 U.S. at 246, 92 S.Ct. 402 (stating that federal courts are without power to decide questions that cannot affect the rights of the litigants in the case before them); *see also U.S. Bancorp Mortgage Co. v. Bonner Mall P'ship*, 513 U.S. 18, 21, 115 S.Ct. 386, 130 L.Ed.2d 233 (1994) (stating that dispute must be justiciable at all stages of litigation); *Preiser v. Newkirk*, 422 U.S. 395, 401, 95 S.Ct. 2330, 45 L.Ed.2d 272

---

2. Federal courts may also decline to find standing on prudential grounds. *Warth*, 422 U.S. at 498, 95 S.Ct. 2197. When a court refuses to find prudential standing, it, in effect, refuses to infer a cause of action from common or statutory law. Fletcher, *supra*, at 252.

(1975) (stating that case or controversy must exist throughout case).

## 2. Standing in Patent Infringement Cases

■ In an action for patent infringement, the issue of whether the plaintiff has standing to sue depends on whether the Patent Act confers on him the right to sue for infringement. *Prima Tek II, L.L.C.*, 222 F.3d at 1376–77. If not, the plaintiff lacks standing, and the district court lacks jurisdiction. *See Gaia Technologies, Inc. v. Reconversion Technologies, Inc.*, 93 F.3d 774, 777 (Fed.Cir.1996), *amended by* 104 F.3d 1296 (Fed.Cir.1996); *see also Rite–Hite Corp. v. Kelley Co., Inc.*, 56 F.3d 1538, 1551 (Fed.Cir.1995) (stating that if in a patent infringement action the statute does not confer standing on the plaintiff, the court lacks jurisdiction). If the plaintiff lacks standing, in essence, no case or controversy exists between the plaintiff and the accused infringer. Timothy R. DeWitt & Tamara S. Klein, *A Fatal Mistake: Lack of Standing at the Time of Filing a Patent Infringement Complaint Results in Dismissal with Prejudice*, 27 AIPLA Q.J. 189, 196 (Summer 1999).

■ The Patent Act provides that "a patentee shall have remedy by civil action for infringement of his patent." 35 U.S.C. § 281. A "patentee" is the party to whom the patent issued or a successor in title to the patent such as an assignee. *See* 35 U.S.C. § 100(d); *see also Prima Tek II, L.L.C.*, 222 F.3d at 1377. In patent law, an assignment is a formal transfer of legal title. *Vaupel Textilmaschinen KG v. Meccanica Euro Italia SPA*, 944 F.2d 870, 875 (Fed.Cir.1991). Therefore, to have standing to sue for patent infringement, one must have held legal title to the patent, i.e., have been the patentee or an assignee, at the time of the alleged infringement. *Arachnid, Inc. v. Merit Indus., Inc.*, 939 F.2d 1574, 1578 (Fed.Cir.1991); *see also Crown Die & Tool Co. v. Nye Tool & Mach. Works*, 261 U.S. 24, 41, 43 S.Ct. 254, 67 L.Ed. 516 (1923) ("[T]he plaintiff in an [infringement] action . . . must be the person or persons in whom the legal title to the patent resided at the time of the infringement."). However, the party holding legal title to a patent may assign the right to sue for past infringement of the patent if it does so expressly. *See Arachnid*, 939 F.2d at 1579 n. 7. In the present case, Schreiber Foods's assignment of the '860 patent to Schreiber Tech included an express grant of the right to sue for past infringement.

■ The statutory definition of "patentee" covers subsequent assignees but does not include licensees. 35 U.S.C. § 100(d). In very limited circumstances, namely where the licensee holds "all substantial rights" to the patent and, therefore, qualifies as a "virtual assignee," the Federal Circuit will permit a licensee to bring an infringement action in its own name.[3] *Speedplay, Inc. v. Bebop, Inc.*, 211 F.3d 1245, 1250 (Fed.Cir.2000); Matthews, *supra*. An exclusive licensee[4] lacks constitutional standing to bring an infringement action in his own name, but may join a suit as a co-plaintiff with a patentee to recover the damages it personally suffers from the infringement where those damages fall within the scope of its exclusive license. *Waterman v. Mackenzie*, 138 U.S. 252, 255, 11 S.Ct. 334, 34 L.Ed. 923 (1891); *see also Rite–Hite Corp.*, 56 F.3d

---

**3.** In the present case, Schreiber Foods does not claim that its license granted it "all substantial rights."

**4.** An exclusive license is merely the promise by the patentee that it will not grant any future licenses to practice the patent. *Rite–Hite Corp.*, 56 F.3d at 1552.

at 1552; *Abbott Labs. v. Diamedix Corp.*, 47 F.3d 1128, 1130–33 (Fed.Cir.1995) (holding that a patentee-licensor must be allowed to intervene in a suit brought improperly by an exclusive licensee because the licensee had no standing to bring the suit alone); Matthews, *supra.*

 A non-exclusive or bare licensee is one who has received only the patentee's promise that he will not be sued for infringement. A non-exclusive licensee has no constitutional standing to sue for infringement. *Intellectual Prop. Dev., Inc. v. TCI Cablevision of Cal., Inc.*, 248 F.3d 1333, 1345 (Fed.Cir.2001). Non-exclusive licensees lack standing not only to bring an action under the patent but even to be a party to such an action. *See Ortho Pharm. Corp. v. Genetics Inst., Inc.*, 52 F.3d 1026, 1031 (Fed.Cir.1995) (stating that "[a] holder of ... a nonexclusive license suffers no legal injury from infringement and, thus, has no standing to bring suit or even join in a suit with the patentee.... [E]conomic injury alone does not provide standing to sue under the patent statute."). This is so even if the non-exclusive licensee suffers more commercial and economic harm from the infringement than the patentee. *Rite–Hite Corp.*, 56 F.3d at 1553–54; *Ortho Pharm. Corp.*, 52 F.3d at 1031.

## B. Effect of Assignment and Licensing Agreement on Jurisdiction

 Defendants argue that when, on March 31, 1997, Schreiber Foods assigned the '860 patent to Schreiber Tech and became a non-exclusive licensee, it lacked standing either to maintain its previously commenced action against Kustner or to commence the action against Great Lakes. Because Schreiber Foods lacked standing, defendants argue, the action against Kustner became moot, and the court never acquired jurisdiction of the action against

Great Lakes. Therefore, in both instances, the court lacked jurisdiction to adjudicate the matter.

 Defendants are entitled to raise the question of the court's jurisdiction because subject matter jurisdiction can be raised at any stage of a proceeding. *Morongo Band of Mission Indians v. Cal. State Bd. of Equalization*, 858 F.2d 1376, 1380 (9th Cir.1988). However, if I determine that this court lacked jurisdiction to enter judgment, my authority is limited to correcting the error I made in entertaining the suit. *United States v. Corrick*, 298 U.S. 435, 440, 56 S.Ct. 829, 80 L.Ed. 1263 (1936). Thus, I turn to the question of whether this court had jurisdiction to adjudicate Schreiber Foods's suits against Kustner and Great Lakes.

On January 7, 1997, when Schreiber Foods commenced its infringement action against Kustner, it held legal title to the '860 patent and, therefore, had standing to sue. However on March 31, 1997, when it became a non-exclusive licensee, Schreiber Foods lost standing to bring or maintain an action for patent infringement. As discussed, non-exclusive licensees lack standing to sue for infringement. *Intellectual Prop. Dev., Inc.*, 248 F.3d at 1345; *see also Ortho Pharm. Corp.*, 52 F.3d at 1031. Further, even assuming, arguendo, that by becoming a non-exclusive licensee Schreiber Foods did not give up the right to sue for infringement occurring before March 31, 1997, Schreiber Foods expressly relinquished that right as part of its assignment agreement with Schreiber Tech. Thus, the result of the transaction with Schreiber Tech was that Schreiber Foods gave up the legal right to sue for infringement of the '860, past or future.

Because Schreiber Foods lost the right to obtain relief for infringement of the '860, its lawsuit against Kustner ceased to be a "present live controversy," *see Hall*

*v. Beals,* 396 U.S. 45, 48, 90 S.Ct. 200, 24 L.Ed.2d 214 (1969), and became moot. This is so because Schreiber Foods no longer had "a legally cognizable interest in the outcome" of the suit. *Powell v. McCormack,* 395 U.S. 486, 496, 89 S.Ct. 1944, 23 L.Ed.2d 491 (1969). An action in federal court becomes moot if the personal interest required to initiate the action ceases to exist. *See Geraghty,* 445 U.S. at 397, 100 S.Ct. 1202; *see also Preiser,* 422 U.S. at 401, 95 S.Ct. 2330 (stating that exercise of judicial power under Art. III depends on the existence of case or controversy); *Steffel v. Thompson,* 415 U.S. 452, 459 n. 10, 94 S.Ct. 1209, 39 L.Ed.2d 505 (1974) (stating that "an actual controversy must be extant at all stages of review, not merely at the time the complaint is filed"); *Rice,* 404 U.S. at 246, 92 S.Ct. 402 (stating that federal courts are without power to decide questions that cannot affect the rights of the litigants before them); *In re Di Giorgio,* 134 F.3d 971, 974 (9th Cir. 1998) (stating that as debtors occupying rental property, plaintiffs could challenge statute authorizing writ of possession, but the moment they vacated the property there was no longer a live case or controversy); *Allard v. DeLorean,* 884 F.2d 464, 466 (9th Cir.1989) (stating that whenever an action loses its "character as a present live controversy" during the course of litigation, federal courts are required to dismiss the action as moot). Based on the above authority, on March 31, 1997, Schreiber Foods's action against Kustner became moot, and this court lost jurisdiction to adjudicate it.

Schreiber Foods did not commence its action for infringement of the '860 against Great Lakes until May 13, 1997, after it had assigned the patent to Schreiber Tech and become a non-exclusive licensee. Thus, when it commenced the suit, Schreiber Foods had already given up legal title to the patent and the right to sue for past infringement and, thus, lacked the interest necessary to bring an infringement action. Therefore, Schreiber Foods had no standing to commence the suit against Great Lakes, and this court never acquired jurisdiction of it.

Schreiber Foods opposes the above conclusions on a number of grounds. I address each in turn.

### 1. Real Party in Interest

Schreiber Foods attempts to overcome the language of the licensing agreement by arguing that, as the parent of Schreiber Tech, it was the real party in interest. It asserts that it controlled Schreiber Tech and had the power to prevent Schreiber Tech from granting other licenses. However, in determining the status of a licensee, what matters is "the intent of the parties to the license as manifested by the terms of their agreement." *Textile Prods., Inc. v. Mead Corp.,* 134 F.3d 1481, 1483 (Fed.Cir.1998). In the present case, the parties' intent to make Schreiber Foods a non-exclusive licensee could not have been clearer. The license explicitly stated that Schreiber Foods "shall have a non-exclusive ... license." (Pl.'s Opp'n Mem. Ex. 2 at 1.) Further, it explicitly stated that only Schreiber Tech could sue for patent infringement. Thus, there can be no doubt that Schreiber Foods was a non-exclusive licensee.

Further, even assuming, arguendo, that Schreiber Foods was an exclusive licensee, it would not have had standing to bring an infringement action in its own name, but only as a co-plaintiff with the holder of legal title, Schreiber Tech. *See Prima Tek II, L.L.C.,* 222 F.3d at 1377; *see also Abbott Lab.,* 47 F.3d at 1130–33; *Waterman,* 138 U.S. at 255, 11 S.Ct. 334. But, Schreiber Tech was never made a party to the litigation.

Schreiber Foods cites a number of cases in support of its claim that it had standing, but all of them are distinguishable either because they did not involve non-exclusive licensees or because they involved licensees seeking to join actions with parties who had constitutional standing, or for both reasons. *See Dainippon Screen Mfg. Co., Ltd. v. CFMT, Inc.,* 142 F.3d 1266 (Fed.Cir.1998); *Kalman v. Berlyn Corp.,* 914 F.2d 1473, 1481–82 (Fed.Cir.1990); *Weinar v. Rollform Inc.,* 744 F.2d 797, 807 (Fed.Cir.1984); *Mi–Jack Prods., Inc. v. Taylor Group, Inc.,* No. 96 C 7850, 1997 WL 441796 at *1, *8 (N.D.Ill. July 30, 1997); *Schneider (Europe) AG v. SciMed Life Sys., Inc.,* 28 U.S.P.Q.2d 1225, 1230 (D.Minn.1993); *Sanofi, S.A. v. Med–Tech Veterinarian Prods. Inc.,* 1983 WL 417, 222 U.S.P.Q. 143, 148 (D.Kan.1983).

▪ Schreiber Foods's argument that it had standing because it controlled Schreiber Tech and, thus, was the real party in interest also fails because corporations are legal entities separate and distinct from their parents and subsidiaries. *See Cent. States, S.E. & S.W. Areas Pension Fund v. Reimer Express World Corp.,* 230 F.3d 934, 944 (7th Cir.2000) (stating that a parent and a subsidiary are two separate entities); *see also* 1 W. Fletcher, *Cyclopedia on Corporations* § 43 (rev. ed.1999) (stating that "[t]here is a presumption of separateness" and that "even when the parent exercises domination and control over the subsidiary, corporate separateness will be recognized").

Schreiber Foods's real party in interest argument is, in essence, a claim that neither Schreiber Tech nor its licensing agreement with Schreiber Foods had substance and that both should be treated as something other than what they were. However, Schreiber Foods points to no deficiency in Schreiber Tech as a corporate entity and no defect in the licensing agreement that would justify treating either as other than bona fide. In fact, it is ironic that Schreiber Foods makes this argument in view of the care that it took to ensure that Schreiber Tech and the licensing agreement would have sufficient legitimacy to withstand a challenge from state revenue officials.

▪ Courts view skeptically requests to ignore the corporate form when such requests come from the party responsible for establishing the corporation. *See McCarthy v. Azure,* 22 F.3d 351, 362–63 (1st Cir.1994); 1 W. Fletcher, *supra,* § 41.70 n. 8 (citing *Sharkey v. Ultramar Energy Ltd.,* 867 F.Supp. 258, 259 (S.D.N.Y.1994), *rev'd on other grounds,* 70 F.3d 226 (2d Cir.1995)) ("Courts take a request to recharacterize a corporation as something else in order to avoid an injustice far more skeptically if the request is coming from the person who voluntarily created and used the corporate entity, especially if another party would be hurt."). Rather, the "better rule would seem to be that a person who has voluntarily adopted the corporate form to engage in business is precluded from asking courts to disregard that form merely because the person is disadvantaged by its use." 1 W. Fletcher, *supra,* § 41.70.

And, in fact, a corporate plaintiff in a patent-infringement case cannot have it both ways by arguing in the infringement case that it holds title to the patent, while in the meantime, assigning the patent to another corporation for tax purposes. *See, e.g., Carver v. Velodyne Acoustics, Inc.,* 202 F.Supp.2d 1147, 1149 (W.D.Wash.2002) (rejecting the request by a non-exclusive licensee to disregard the distinction between it and the patentee so that it could recover damages for infringement and stating that one "may not … take advantage of the corporate form and simultaneously shun its disadvantages."). In

*Lans v. Gateway 2000, Inc.*, 84 F.Supp.2d 112, 121 n. 8 (D.D.C.1999), *aff'd, Lans v. Digital Equip. Corp.*, 252 F.3d 1320, 1328 (Fed.Cir.2001), the court explained:

> Lans [the inventor] states that "[s]ince I am the only shareholder of Uniboard [the asignee corporation], it has never been a matter of concern to me, other than for tax purposes, whether I or Uniboard was the owner of the patent." ... The Court believes that is precisely the point. Since Lans was clear on the distinction between himself and the corporation when it came to the tax benefits of having Uniboard handle the licensing of the patent to IBM, he was on notice that the distinction carried over to other aspects of the patent, such as which party could properly sue for its infringement.

The *Lans* court went on to point out that "[o]ne of the more important and pervasive principles underlying corporations law is the 'entity theory.' This theory provides that a corporation is a separate entity, distinct from its corporate and non-corporate shareholders," *id.* at 123 n. 10, and that "the law generally does not allow the option of 'reverse piercing' the corporate veil when it suits the corporation's owner," *id.* (internal citations omitted).

For the foregoing reasons, Schreiber Foods's argument that, notwithstanding its assignment of the '860 and the unambiguous terms of its licensing agreement, it had standing to sue is unpersuasive.

### 2. Res Judicata

 Schreiber Foods argues that I may not address subject matter jurisdiction because of the doctrine of res judicata, which bars litigation of matters that were or could have been litigated in a previous action resulting in a judgment. *Stericycle, Inc. v. City of Delavan*, 120 F.3d 657, 659 (7th Cir.1997). However, the argument fails for two reasons. First, the issue of subject matter jurisdiction was not previously litigated nor could it have been because Schreiber Foods concealed the facts giving rise to the issue, i.e., that it assigned the '860 patent and became a non-exclusive licensee. Second, judgment was not granted in a previous action but in an earlier proceeding in the present case.

### 3. Finality/Judicial Economy

 Next, Schreiber Foods argues that the judgment should be upheld because of the interests of finality and judicial economy. However, as discussed, if at any time in the course of litigation, a case or controversy ceases to exist, federal courts lose jurisdiction to adjudicate the matter. A judgment that was entered by a court without jurisdiction cannot be saved by invoking the interests of finality and judicial economy.

In support of its argument, Schreiber Foods cites *Caterpillar Inc. v. Lewis*, 519 U.S. 61, 77–78, 117 S.Ct. 467, 136 L.Ed.2d 437 (1996), in which the Supreme Court held that where a case was removed without the parties being diverse as required by the removal statute, the defect was cured because diversity existed at the time of trial. *See id.* at 74–75, 117 S.Ct. 467. However, *Caterpillar Inc.* is distinguishable on several grounds.

First, in the present case, the jurisdictional problem is more fundamental than it was in *Caterpillar Inc.* In the present case, the constitutional case or controversy requirement was not satisfied. *See, e.g., E. Ky. Welfare Rights Org.*, 426 U.S. at 36–37, 96 S.Ct. 1917 (stating that no principle is more fundamental to the judiciary's proper role in our system of government than the constitutional limitation of federal court jurisdiction to cases or controversies). Because there was no case or controversy, this court lacked constitutional

power to enter judgment against defendants. By contrast, in *Caterpillar Inc.*, the jurisdictional problem was purely statutory.

Second, in *Caterpillar Inc.*, the jurisdictional problem was cured before trial. By contrast, in the present case the defect was not addressed until long after trial.

Third, in *Caterpillar Inc.*, the plaintiff suffered no tangible harm from the absence of jurisdiction, whereas in the present case defendants were prejudiced severely by the undisclosed jurisdictional defect and the resulting judgment. As will be discussed in greater detail, Schreiber Foods's failure to disclose the assignment and licensing agreement prevented defendants from raising the question of jurisdiction, contesting the validity of the '724 patent and disputing Schreiber Foods's damage calculations.

Finally, in *Caterpillar Inc.*, the Supreme Court stressed the fact that the case was a diversity case, and that a retrial would burden the state courts. The court stated that "[t]o wipe out the adjudication post-judgment ... would impose an exorbitant cost on our dual court system." *Caterpillar Inc.*, 519 U.S. at 76, 117 S.Ct. 467. By contrast, in the present case, no federalism concerns are present.

For the foregoing reasons, Schreiber Foods's argument that the judgment should be upheld based on finality and judicial economy must be rejected.

### 4. Post–Trial Cancellation of License and Reassignment of Patent

Next, Schreiber Foods argues that Schreiber Tech's cancellation of the licensing agreement and reassignment of the '860 to it approximately eight months after trial cured the lack of subject matter jurisdiction. However, as discussed, an Art. III case or controversy must be ex-

tant throughout a case. *See, e.g., Steffel,* 415 U.S. at 459 n. 10, 94 S.Ct. 1209. If, at any time, a case or controversy ceases to exist, the court loses its constitutional authority to adjudicate the matter. *See, e.g., Rice,* 404 U.S. at 246, 92 S.Ct. 402. In the present case, on March 31, 1997, when Schreiber Foods assigned the patent and became a non-exclusive licensee, a case or controversy ceased to exist in the action against Kustner. Moreover, as discussed, a case or controversy never existed in the action against Great Lakes. Thus, in neither case was the requirement that a case or controversy be present throughout the case satisfied. Schreiber Tech's post-trial cancellation of Schreiber Foods's license and reassignment of the '860 to Schreiber Foods could not undo these jurisdictional defects.

In addition, as will be discussed, defendants suffered severe prejudice from having to litigate the case without being made aware of the assignment and licensing agreement. For this reason also, Schreiber Foods's post-trial cancellation of the licensing agreement and re-assignment of the patent cannot save its judgment.

### 5. Fed.R.Civ.P. 25(c)

Rule 25 permits an action to continue if the original party has died, become incompetent, transferred his interest, or if a public officer has been succeeded by someone else. Alternatively, on motion, a court may direct the person to whom the interest was transferred to be substituted for or joined with the transferor for the remainder of the proceedings. The rule is designed to allow an action to continue unabated when an interest changes hands without the need for a new lawsuit. 6 James Wm. Moore et al., *Moore's Federal Practice* § 25.30[2] (3d ed.2003).

However, Rule 25(c) is a purely procedural mechanism and does not permit

a plaintiff to continue a suit if the plaintiff's right to recover from the defendant does not survive the transaction in which its interest is transferred. *ELCA Enters., Inc. v. Sisco Equip. Rental & Sales, Inc.,* 53 F.3d 186, 191 (8th Cir.1995); *see also Gen. Battery Corp. v. Globe–Union, Inc.,* 100 F.R.D. 258, 261 (D.C.Del.1982) (granting a patentee's pre-trial motion to join the asignee of the patent as a party and explaining that Rule 25(c) "does not determine what actions shall survive a transfer of interest by a party, it deals only with the mechanics of substitution in an action which does survive under applicable substantive law.").

 Schreiber Foods argues that Rule 25(c) enabled it to continue its suit against Kustner even after it assigned the '860 to Schreiber Tech and became a non-exclusive licensee.[5] However, Schreiber Foods's argument fails because under substantive patent law principles, its right to obtain relief from Kustner did not survive the transaction with Schreiber Tech. First, unlike in *General Battery,* Schreiber Foods did not merely assign the patent to another entity, it also took a non-exclusive license in the patent. As discussed, when it became a non-exclusive licensee, it lost the right to maintain an action for infringement. *Intellectual Prop., Inc.,* 248 F.3d at 1345; *Ortho–Pharm. Corp.,* 52 F.3d at 1031. Rule 25(c), which is purely procedural, cannot undo this result.

Further, even assuming, arguendo, that by becoming a non-exclusive licensee, Schreiber Foods did not give up the right to sue for infringement occurring before March 31, 1997, it expressly relinquished that right as part of its assignment agreement with Schreiber Tech, as it had a right to do under substantive patent law principles. *See Crown Die & Tool Co.,* 261 U.S. at 40–41, 43 S.Ct. 254. In this respect also, the present case is distinguishable from *General Battery* and, again, Rule 25(c) may not be used to alter the legal consequences of the transaction.

In sum, Schreiber Foods's right to obtain relief for infringement of the '860 patent, past or future, did not survive its transaction with Schreiber Tech. Therefore, Rule 25(c) is of no benefit to it. *ELCA Enters., Inc.,* 53 F.3d at 191; *see also* 28 U.S.C. § 2072(b); Fed.R.Civ.P. 82.

 Schreiber Foods may be suggesting that Rule 25(c) permitted it to continue the suit as a substitute for Schreiber Tech rather than on its own behalf. However, this argument also fails because if a plaintiff transfers an interest that is the subject of a lawsuit, the transferee stands in its shoes. *Brook, Weiner, Sered, Kreger & Weinberg v. Coreq, Inc.,* 53 F.3d 851, 852 (7th Cir.1995); *see also Minn. Mining & Mfg. Co. v. Eco Chem, Inc.,* 757 F.2d 1256, 1263 (Fed.Cir.1985). Thus, if during litigation, a plaintiff/transferor give up the right to obtain relief, the fact that the plaintiff is pursuing the case on behalf of a successor in interest does not change the result. This is so because the status of the successor tracks the position of the original litigant. *Brook, Weiner, Sered, Kreger & Weinberg,* 53 F.3d at 852. Any other rule would make a shambles of litigation. *Id.; see also Matter of Covington Grain Co., Inc.,* 638 F.2d 1362, 1364 (5th Cir.1981) (stating that "Rule 25(c) is not designed to

---

**5.** Rule 25(c) could not affect Schreiber Foods's action against Great Lakes because it only applies when a litigant transfers an interest in property involved in a suit after the suit was commenced. *Horphag Research Ltd. v.*

*Consac Indus., Inc.,* 116 F.3d 1450, 1453 (Fed.Cir.1997). Schreiber Foods commenced its suit against Great Lakes before engaging in the transaction with Schreiber Tech.

create new relationships among parties to a suit").

Thus, in the present case, Rule 25(c) did not authorize Schreiber Foods to continue the lawsuit against Kustner on its own behalf or on behalf of Schreiber Tech.

### 6. Fed.R.Civ.P. 21

■ Schreiber Foods argues that its judgment may be preserved if I add Schreiber Tech as a party pursuant to Rule 21, which permits parties to be added or dropped at "any stage of the action and on such terms as are just." Fed.R.Civ.P. 21. However, as discussed, I have found that this court had no jurisdiction to adjudicate the case. Thus, other than to vacate judgment, I have no authority to take action in the case. *Corrick*, 298 U.S. at 440, 56 S.Ct. 829; *see also Bailey v. Sharp*, 782 F.2d 1366, 1373 (7th Cir.1986).

■ Further, even assuming that I had the authority to grant Schreiber Foods's Rule 21 motion, there are no just terms on which I could do so. This is so for several reasons. First, adding Schreiber Tech as a party would not affect the fact that as a non-exclusive licensee, Schreiber Foods had no right to sue, to be a co-plaintiff or to be awarded judgment. Second, as will be discussed, Schreiber Foods's failure to disclose the assignment and licensing agreement was highly prejudicial to defendants.

### 7. Effect of Adding '724 Patent to Infringement Actions

■ Schreiber Foods might argue that in January 1998, when it added the '724 patent to the suits against Kustner and Great Lakes, it supplied the jurisdiction that was missing. As previously stated, Schreiber Foods did not assign the '724 to Schreiber Tech, thus, it held legal title to the patent. However, as discussed, a case or controversy must be extant at all stages of a case. *See, e.g., Arizonans for Official English*, 520 U.S. at 67, 117 S.Ct. 1055. On March 31, 1997, a case or controversy ceased to exist in the action against Kustner, and a case or controversy never existed in the action against Great Lakes. Thus, in January 1998, no live cases existed to which the '724 patent could be added.

### C. Defendants' Rule 60(b)(4) Motion

■ For the reasons stated, Schreiber Foods's arguments that this court retained jurisdiction, notwithstanding that it assigned the '860 and became a non-exclusive licensee, are not persuasive. Thus, I turn to defendants' Rule 60(b)(4) motion. Rule 60(b)(4) permits a court to relieve a party of a "void" judgment. A court may find a judgment void under Rule 60(b)(4) only if the court that rendered the judgment lacked subject matter or personal jurisdiction, or if it acted in a manner inconsistent with due process of law. *O'Rourke Bros. Inc. v. Nesbitt Burns, Inc.*, 201 F.3d 948, 951–53 (7th Cir.2000). For a judgment to be found void for lack of subject matter jurisdiction, the jurisdictional error must have amounted to a clear usurpation of judicial power. *United States v. Tittjung*, 235 F.3d 330, 335 (7th Cir.2000). An erroneous decision concerning subject matter jurisdiction after the question has been litigated does not make a judgment void. *See Williams v. North Carolina*, 325 U.S. 226, 230, 65 S.Ct. 1092, 89 L.Ed. 1577 (1945). "However, when the rule 60(b)(4) motion alleges that 'the underlying judgment is void because the court lacked personal or subject matter jurisdiction,' once the court decides that the allegations are correct 'the trial judge has no discretion and must grant appropriate Rule 60(b) relief.'" *Bally Exp. Corp. v. Balicar, Ltd.*, 804 F.2d 398, 400 (7th Cir.1986) (quoting *Textile Bank-*

*ing Co., Inc. v. Rentschler*, 657 F.2d 844, 850 (7th Cir.1981)).

■ In the present case, when Schreiber Foods assigned the '860 patent and became a non-exclusive licensee, a case or controversy ceased to exist, and the case was no longer justiciable. Thus, when it rendered judgment, this court clearly exceeded the scope of its authority. Moreover, the issue of subject matter jurisdiction was not litigated before judgment was granted. This is so because Schreiber Foods concealed the facts that gave rise to the issue, thus preventing defendants and the court from becoming aware of them. Because the court lost jurisdiction of Schreiber Foods's action against Kustner and never acquired jurisdiction of its suit against Great Lakes, Schreiber Foods's judgment is void, and defendants' motion for relief under Rule 60(b)(4) will be granted.

## III. DEFENDANTS' ALTERNATIVE MOTIONS

Assuming, arguendo, that this court had jurisdiction over either or both of Schreiber Foods's infringement actions, defendants argue that the judgment must nevertheless be vacated pursuant to Rules 59, 60(b)(3) and 60(b)(2). Schreiber Foods argues that defendants' Rule 59 motion is untimely. However, I need not address the timeliness or the substance of the Rule 59 motion because I conclude that defendants are entitled to relief under both Rules 60(b)(3) and 60(b)(2). I address each motion in turn.

## A. Defendants' Rule 60(b)(3) Motion

### 1. Requirements for Obtaining Relief

■ Rule 60(b)(3) provides that a court may relieve a party from a judgment if the judgment was obtained by the adverse party's "fraud ..., misrepresentation, or other misconduct." Fed.R.Civ.P. 60(b)(3). Under Rule 60(b)(3), both intentional and unintentional misrepresentations and failures to disclose are a sufficient basis for relief. 12 James Wm. Moore et al., *Moore's Federal Practice* § 60.43[1][a] (3d ed.2003); *see also Lonsdorf v. Seefeldt*, 47 F.3d 893, 897 (7th Cir.1995). The moving party must prove misrepresentation by clear and convincing evidence. *Simons v. Gorsuch*, 715 F.2d 1248, 1253 (7th Cir. 1983).

■ Misrepresentations may occur in a number of contexts. A party's failure to truthfully respond to discovery requests may be sufficient to set aside a judgment. *See, e.g., Schultz v. Butcher*, 24 F.3d 626, 630–31 (4th Cir.1994) (stating that boat operator's failure to supply copy of Coast Guard report to boat owner in response to discovery request merited granting of Rule 60(b)(3) motion); *see also Rozier v. Ford Motor Co.*, 573 F.2d 1332, 1342 (5th Cir.1978) (internal citation omitted) (stating that defendant's lack of response to interrogatory merited granting of motion because "[w]e are left with the firm conviction that disclosure of the Trend Cost Estimate would have made a difference in the way plaintiff's counsel approached the case or prepared for trial"). Similarly, false trial testimony may be a basis for relief. *Harre v. A.H. Robins Co., Inc.*, 750 F.2d 1501, 1504 (11th Cir.1985).

■ In order to obtain relief under Rule 60(b)(3), in addition to proving a misrepresentation, the moving party must show that it was prevented from fully and fairly presenting its case at trial. *Lonsdorf*, 47 F.3d at 897. However, this obligation does not require the movant to prove that it would prevail in the event of a retrial. *Id.* This is so because the purpose of the rule is to protect the fairness and integrity of litigation in the federal

courts, *id.* at 898, and to provide relief from judgments that were obtained as the result of unfair conduct, *Rozier,* 573 F.2d at 1339. Finally, where the movant is the defendant it must allege that it has a meritorious defense to the plaintiff's claim. *Assmann v. Fleming,* 159 F.2d 332, 336 (8th Cir.1947).

### 2. Application of Standard

#### a. Misrepresentations

In the present case, in the course of obtaining judgment against defendants, Schreiber Foods's agents affirmatively misrepresented facts and failed to disclose material information. Schreiber Food's suits themselves were founded on the false assertion that after March 31, 1997, Schreiber Foods continued to hold legal title to the '860 patent. This misrepresentation was repeated by Schreiber Foods both during discovery and at trial.

During discovery, three of defendants' document requests called for the production of documents that, if produced, would have revealed that Schreiber Foods did not own the '860 patent, but held a non-exclusive license in it. One request asked for all documents concerning agreements relating to the '860, a second requested documents relating to any assignments or licenses involving the '860, and a third asked for copies of any patent licenses presently in effect between Schreiber Foods and any related or unrelated entities. In response, Schreiber Foods produced no documents and instead affirmatively misrepresented that no patent licenses were in effect.

At trial, Schreiber Foods's board member, Thomas Badciong, who was present at a board meeting at which the assignment and licensing agreement were approved, testified as follows:

Q. Let me show you, Mr. Badciong, what have been marked as Plaintiff's Exhibit 1 and 2. Can you identify those for the jury, please?

A. Yes, I can.

Q. And what are the two exhibits? What's Exhibit 1?

A. Exhibit 1 is a copy of the—or is the '860 patent.

Q. And Exhibit 2?

A. It's the '724 patent.

Q. These patents are owned by Schreiber Foods; is that right?

A. Yes, they are.

Q. And for what period of time did Schreiber own those patents?

A. Since we received them.

Q. Since they were issued by the Patent Office?

A. Yes, since they were issued by the Patent Office.

(McElwain Decl. Ex. 11.)

This testimony misrepresented the facts. The truth was that after March 31, 1997, Schreiber Foods did not own the patent. Schreiber Tech owned the patent and Schreiber Foods held a non-exclusive license in it.

Moreover, in September 1998, approximately five weeks after trial, Schreiber Foods's trial counsel discovered that on March 31, 1997, Schreiber Foods had assigned the '860 patent to Schreiber Tech and taken a non-exclusive license in the patent. Nevertheless, counsel elected not to disclose this fact to defendants or to the court. Instead, counsel advised Schreiber Foods to cancel the licensing agreement and have Schreiber Tech reassign the patent to it. The employees of Schreiber Foods who were involved in the cancellation of the licensing agreement and the reassignment of the patent were instructed not to disclose the transaction. They be-

lieved that the transaction was effected for purposes of the litigation.

Thus, Schreiber Foods and its representatives both affirmatively misstated and failed to disclose information material to the litigation.

#### b. Effect of Misrepresentations

■ Had defendants known that Schreiber Foods assigned the '860 patent to Schreiber Tech, they could have raised a number of arguments and lines of defense that would have affected the outcome of the litigation. As discussed, defendants could have argued that as a non-exclusive licensee Schreiber Foods had no standing to be a party to the infringement actions, and that as a result the court lacked jurisdiction.

Even if Schreiber Foods could have overcome the jurisdictional problem, defendants still could have made a number of strong arguments based on the assignment and licensing agreement. Defendants would have had a compelling argument that the '724 patent was unenforceable because it was not commonly owned with the '860. *See, e.g., Merck & Co., Inc. v. U.S. Int'l Trade Comm'n,* 774 F.2d 483, 485 (Fed.Cir.1985) (stating terminal disclaimer could cause disclaimed patent to expire if it were separated from the four patents with which it was to be commonly owned). As discussed, the PTO issued the '724 on the condition that it would be enforceable only if it was commonly owned with the '860, and Schreiber Foods filed a terminal disclaimer stating that the '724 "shall be enforceable only for and during such period that it and the prior patent [the '860] are commonly owned." (McElwain Decl. Ex. 7.) In fact, the '724 and the '860 were never commonly owned, even at the time that Schreiber Foods filed the terminal disclaimer because prior to filing the disclaimer, Schreiber Foods had already assigned the '860 to Schreiber Tech. At trial, the jury found that defendants had infringed the '724 and awarded damages to Schreiber Foods for such infringement. If defendants had known about the assignment of the '860, it is unlikely that the issue of whether the '724 was infringed would have even gotten to the jury.

Had defendants known of the assignment and licensing agreement, they also could have made powerful arguments relating to damages. Because Schreiber Tech was a pic and did not sell cheese, it could not have recovered damages for profits on lost sales of cheese, as did Schreiber Foods. *Rite–Hite Corp.,* 56 F.3d at 1548 (stating that if the holder of legal title to a patent does not sell a product, by definition it cannot recover lost profits); *see also* John M. Skenyon et al., *Patent Damages Law & Practice* § 7.2 (stating that "patent owners that do not practice their patents, such as holding companies, must settle for a reasonable royalty"); Matthews, *supra.* The jury awarded Schreiber Foods damages for lost profits from lost sales and price erosion in the amount of $5,469,846 against Kustner and $911,641 against Great Lakes. These damages would not have been available to Schreiber Tech. Also, defendants could have argued to the jury that the best evidence of what a reasonable royalty rate was was the 1.5 percent royalty that Schreiber Foods paid to Schreiber Tech, a percentage approximately six times less than the nine percent royalty rate for which Schreiber Foods's damage expert argued.

For the above reasons, Schreiber Foods's failure to disclose the assignment and licensing agreement prevented defendants from fully and fairly presenting their case. Further, defendants have alleged valid defenses to the infringement claims. Therefore, in the event that my conclusion

with respect to defendants' motion under Rule 60(b)(4) is mistaken, I would grant their motion to vacate judgment under Rule 60(b)(3).

## B. Defendants' Rule 60(b)(2) Motion

Defendants also seek relief under Rule 60(b)(2), which authorizes a court to vacate a judgment on the basis of "newly discovered evidence which by due diligence could not have been discovered in time to move for a new trial under Rule 59(b)." Fed. R.Civ.P. 60(b)(2). In *United States v. McGaughey*, 977 F.2d 1067, 1075 (7th Cir. 1992), the Seventh Circuit specified that to obtain relief based on newly discovered evidence, the moving party must establish the following elements: (1) the newly discovered evidence must have existed at the time of trial or must concern facts that were in existence at the time of trial; (2) the evidence must have been discovered following the trial; (3) the moving party must have shown due diligence to discover the evidence; (4) the evidence must be admissible; (5) the evidence must be credible; (6) the evidence must be material to the issues tried; (7) the evidence must not be merely cumulative or impeachment evidence; and (8) the evidence must be so significant that it is likely to change the outcome of the case.

In the present case, defendants satisfy each of these requirements. First, the assignment and licensing agreement at issue existed at the time of the trial. Second, defendants discovered the existence of these documents on October 9, 2002, more than four years after the trial. Third, defendants exercised due diligence in seeking to discover the evidence. Defendants sent Schreiber Foods requests for the production of documents that, if produced, would have revealed that Schreiber Foods did not own the '860 patent but rather held a non-exclusive license

in it. In response, Schreiber Foods produced no documents and affirmatively misrepresented that no patent licenses were in effect. Defendants' requests constituted due diligence. Defendants were entitled to accept Schreiber Foods's answers to their discovery requests as accurate and not to seek additional discovery relating to the issue. *ELCA Enters., Inc.*, 53 F.3d at 190 (stating that "for litigation to function efficiently, parties must provide clear and accurate responses to discovery requests").

Fourth, the assignment and licensing agreement would have been admissible at trial. Fifth, the evidence would have been credible. Sixth, the evidence was material to the issues tried. In an action for patent infringement, the plaintiff's interest in the patent is critical to the issues of standing, liability and damages. Seventh, the evidence was not cumulative and not merely impeaching. As previously discussed, the assignment and licensing agreement would have raised new issues including Schreiber Foods's standing and the enforceability of the '724 patent. Finally, as previously discussed, the evidence would have dramatically altered the nature of the case and surely affected its outcome in one or more respects.

For the above reasons, I conclude that defendants would also be entitled to relief under Rule 60(b)(2).

## IV. CONCLUSION

When Schreiber Foods created the pic and assigned the '860 patent to it, it failed to consider the price that it might pay for the transaction in the event of an infringement involving the assigned patent. *See* Matthews, *supra* (stating that "[i]f, to protect the commercial interests of the manufacturer, the need arises to enforce a patent transferred to the patent-holding company, the manufacturer will probably pay a heavy price for having transferred

its infringed patent to the holding company"). Although the price is heavy, under the law Schreiber Foods's judgment against defendants must be vacated. The judgment is void, and I therefore grant relief pursuant to Rule 60(b)(4). Alternatively, I conclude that defendants are entitled to relief under Rule 60(b)(3) and 60(b)(2).

Therefore,

**IT IS HEREBY ORDERED** that defendants' motion to vacate judgment (docket number 262) is **GRANTED**, the judgment obtained by Schreiber Foods against defendants Kustner and Great Lakes is **VACATED** and this matter is **DISMISSED**.